IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY L. VOIGHT, | ) | |
| | ) | |
| Plaintiff-Claimant, | ) | |
| | ) | No. 10 C 7847 |
| v. | ) | |
| | ) | Jeffrey T. Gilbert |
| MICHAEL J. ASTRUE, Commissioner | ) | Magistrate Judge |
| of Social Security, | ) | |
| | ) | |
| Defendant-Respondent. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Claimant Tammy L. Voight ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), in which the Commissioner denied Claimant's application for disability insurance benefits. This matter is before the Court on Claimant's motion to reverse the decision of the Commissioner (effectively a motion for summary judgment) [Dkt#18]. Claimant raises the following issues in support of her motion: (1) whether the Administrative Law Judge ("ALJ") properly discounted Claimant's credibility; (2) whether the ALJ misstated or misapprehended facts in the record in way that undermined her decision and was not harmless error; (3) whether the ALJ properly analyzed Claimant's mental impairments; and (4) whether the ALJ's decision to deny benefits should be reversed and benefits should be awarded to Claimant by this Court. For the reasons set forth below, the Claimant's motion is granted in part and denied in part. The decision of the ALJ is reversed and this matter is remanded to the Social Security Administration for further proceedings consistent with this opinion.

# I.     BACKGROUND

## A.     Procedural History

Claimant filed an application for disability benefits on September 25, 2007, alleging that she became unable to work due to her disability on August 23, 2007.  R.23, 118.  Claimant's attorney amended this date to September 15, 2007 in a letter to the Social Security Administration ("SSA") dated July 14, 2009.  R.23, 45.  Claimant's date last insured was June 30, 2009.[1]  R.25.  The SSA initially denied her application on March 25, 2008.  R.66.  Claimant then filed a request for reconsideration, which the SSA denied on May 23, 2008.  R.74–76. Shortly thereafter on June 19, 2008, Claimant requested a hearing before an ALJ.  R.77–82.

On July 7, 2009, Claimant appeared with her attorney and testified at a hearing before ALJ Janice Bruning.  R.42.  Vocational Expert Timothy Brubowski also testified at the hearing. *Id*.  No medical expert testified at the hearing.

On January 6th, 2010, the ALJ rendered a decision finding that Claimant was not disabled under the Social Security Act.  R.31.  Specifically, the ALJ determined that Claimant "had the functional ability to perform at least sedentary work" and that she was capable of adjusting to performing unskilled work although she was no longer capable of performing her past work which was skilled or semi-skilled in nature.  R.30–31.

On July 9, 2010, Claimant filed a request for review of the ALJ's decision which was denied by the Appeals Council on October 29, 2010.  R.1–6.  Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

---

[1] Because Social Security disability benefits under Title II are insurance pay-outs against lost income caused by a disability, the applicant must show a recent connection to the work force to maintain insured status.  42 U.S.C. § 423(c) and 20 C.F.R. § 404.130.  This generally means the applicant was working in 20 of the last 40 quarters. For an applicant who is 31 years old or older, the "last date of insured status" generally is five years after his or her date of last work.

2

**B.     Hearing Testimony - July 7, 2009**

**1.     Claimant Tammy L. Voight**

At the time of the hearing, Claimant was 42 years old and living with her husband and two children from a previous marriage, ages 5 and 8.  R.27, 44, 120. Claimant finished the 12th grade and earned a vocational degree from a cosmetology school.  R.27. While sitting for her cosmetology state board examinations when she was 18 or 19 years old (the record is equivocal about her age at the time), Claimant experienced a deep vein thrombosis and a pulmonary embolism in her left leg.  R.45, 523.  The resulting swelling, pain and circulatory impairment in her leg has caused her difficulty over the years.  Claimant has additional health problems, principally osteopenia, depression, obesity, and endometriosis.  R.25, 910.  Claimant's prior work experience is varied and includes several clerical and billing positions in the insurance industry.  R.120–127, 130–137.

Claimant testified that she had not worked since August 23, 2007, due to complications with her left leg.  R.45.[2]  According to her testimony, Claimant was diagnosed with a blood clot stemming from a genetic disorder, a condition she has treated with anti-coagulant medications and support stockings.  R.45–46, 50.  Claimant testified that the chronic pain she suffers as a result of her condition will not benefit from surgery.  R.46.  Claimant also testified that both standing and sitting cause her pain and that the swelling in her left leg is chronic.  *Id.*  According to Claimant, elevating her legs to a height of three feet while lying down ameliorates the pain and swelling, and she does this four times a day for 45 minutes to an hour.  R.46, 56.

Claimant testified that she can walk as far as a city block with some difficulty.  R.48. She can stand for about 15 minutes at a time and can sit for up to an hour, provided she can

---

[2] As referenced above, Claimant's date of last employment was later amended by her attorney to September 15, 2007.

elevate her legs to a sufficient height. *Id.* Claimant stated that her chronic leg pain makes sleeping difficult. R.50.

Claimant testified that she is able to shower and dress herself and attend to personal hygiene. R.50. She stated that she drives her children to and from school and their other activities. R.50, 54. Claimant testified that she does household chores such as preparing family meals, doing laundry, making beds, and dusting. R. 51. She does the grocery shopping with her husband's assistance. *Id.* Claimant regularly attends church and special events at her children's school where she volunteers as an assistant during classroom parties. R.52–53. A typical day for Claimant includes getting her children ready for school, preparing the family dinner, and spending most of her free time at home reading the Bible and elevating her legs. R.55.

Claimant also testified that she receives treatment for depression and has trouble with concentration and memory. R.47. She attributes a portion of these mental impairments to her pain and concedes that the medication she is taking for depression is helpful. R.47–48.

### 2.    Vocational Expert Timothy Brubowski

The Vocational Expert ("VE"), Timothy Brubowski, described Claimant's past relevant work as a collections clerk, administrative assistant, underwriting assistant, technical assistant and communications attendant, all of which he categorized as sedentary and either skilled or semi-skilled. R.57–58. The ALJ asked the VE what type of work, if any, an individual of the Claimant's age, education, and experience could perform with the following limitations: lifting no more than 20 pounds occasionally and no more than 10 pounds frequently; standing or walking no more than two hours during an eight-hour workday; sitting at least six hours during an eight-hour workday; requiring an option to sit/stand at will; inability to work at heights, move machinery, or climb ladders, rope or scaffolding; occasional ability to climb ramps and stairs and

occasional balancing, stooping, crouching, kneeling, or crawling; and a need to elevate her left leg with a footstool. R.58. The VE testified that based on this hypothetical, an individual with the above limitations could perform the duties of a surveillance systems monitor or a general office clerk. R.58–59.

The ALJ then asked the VE a follow-up question modifying the hypothetical and adding an additional restriction that the individual would be "off-task 20 percent of the workday because of the need to lie down and elevate [her] leg." R.59. The VE responded that based on the revised hypothetical, such an individual would be unable to find work. *Id.*

## C. Medical Evidence

### 1. Dr. Joseph Meschi – Hematologist & Oncologist

From 2003 to 2006, Claimant was a patient of Dr. Joseph Meschi, a hematologist and oncologist affiliated with Rush Copley Medical Center. Claimant saw Dr. Meschi in connection with the circulatory problems in her legs which put her at risk for a thrombosis such as she experienced in approximately 1986 during her cosmetology state board exam. R.271, 310, 473.

In 2003, during her second pregnancy, Claimant tested positive for a Factor V Leiden mutation, an MTHFR mutation, and a possible Protein S deficiency, genetic disorders which elevate the risk of blood clots. R.310, 311, 315. In light of these results, Dr. Meschi placed Claimant on two anti-coagulant medications, Lovenox and Coumadin. R.310, 314. In his notes following an office visit on November 20, 2003, Dr. Meschi speculated that the deep vein thrombosis and pulmonary embolism Claimant experienced in 1986 may have been secondary to the birth control bills she was taking at the time. R.315. Dr. Meschi's notes state that Claimant was "feeling fine" and had "no complaints." *Id.* A subsequent study done on May 29, 2003 and likely ordered by Dr. Meschi confirmed the finding of a Factor V Leiden mutation. R.253. At a

December 18, 2003 visit with Dr. Meschi, Claimant showed no signs of blood clotting or lower extremity swelling. R.316.

At a March 18, 2004 visit, Dr. Meschi advised Claimant not to take "fat burning pills" out of concern that they might interact with her Coumadin. R.317. At a September 17, 2004 visit, Claimant did not report any swelling in her legs and showed no evidence of a thrombosis. R.321.

Regarding a March 18, 2005 visit, Dr. Meschi's notes state that Claimant had no swelling in her legs and displayed no evidence of a thrombosis. R.319. He recommended that Claimant continue to take anti-coagulant medication indefinitely and return for a follow-up in a year. *Id.* At a December 28, 2005 office visit, Claimant discussed with Dr. Meschi how her hypercoagulability would affect a tummy tuck operation she was undergoing on January 17, 2006. R.310. Dr. Meschi consulted with the surgeon about ways of modifying the surgery to minimize the risk of blood clots and the amount of time Claimant would be off anti-coagulants. *Id.* Dr. Meschi informed Claimant that the surgery would be high risk given her genetic predisposition for blood clots. *Id.* Claimant wanted to have the surgery despite the risk.[3] *Id.*

Claimant did not return to see Dr. Meschi until August 8, 2006. During that appointment, she complained of a worsening of the swelling in her left leg. R.318. Dr. Meschi's notes state that Claimant had stopped taking her Coumadin for several months because she was depressed about her divorce and her mother's recent death. *Id.* Dr. Meschi recommended that Claimant restart anti-coagulant medications. *Id.* Dr. Meschi had an ultrasound done on August 9, 2006 which showed no signs of blood clotting in Claimant's legs. R.304, 342.

---

[3] The record does not appear to reveal whether the procedure ever was performed.

### 2.    Dr. Nicholas Zoretic – Family Practitioner

In early 2007, Claimant was seen briefly by Dr. Nicholas Zoretic, who operates a family practice.[4]  A February 19, 2007 ultrasound ordered by Dr. Zoretic showed no signs of blood clotting in Claimant's legs.  R.344.  On February 21, 2007, Dr. Zoretic referred Claimant to Dr. John Ayers, a hematologist, for treatment based on her history of deep vein thrombosis and hypercoagulability.  R.354.  On April 19, 2007, Dr. Zoretic referred Claimant to Dr. Samer Najjar, a vascular surgeon, for treatment of her "varicose veins[,] venous insufficiency [and] leg pain."  R.309.

### 3.    Dr. John Ayers – Hematologist

Dr. Ayers ordered tests done on Claimant some time prior to an office visit on April 3, 2007, which confirmed her Factor V Leiden mutation and raised a "question of a protein S deficiency."  R.361.  Dr. Ayers noted that Claimant had been taking Coumadin but took herself off the medication "and is actually doing okay" with "no evidence of thrombosis."  R.362.  Dr. Ayers recommended that she stay off Coumadin and take baby aspirin.  *Id.*  Dr. Ayers recommended seeing Claimant on an "intermittent basis in the future."  *Id.*

### 4.    Dr. Samer Najjar – Vascular Surgeon

In accordance with Dr. Meschi's referral, Claimant also saw Dr. Samer Najjar in connection with the varicose veins in her left leg.[5]  Dr. Najjar's notes from an April 25, 2007, office visit state that Claimant was "complaining of significant throbbing pain and heaviness" in her left leg.  R.386.  Dr. Najjar's notes also report that Claimant's pain was "only mildly improved with elevation."  *Id.*  Additionally, Dr. Najjar's notes mention that Claimant

---

[4] Dr. Zoretic's name is occasionally misspelled as "Zorelle" in the record.

[5] While this was the basis for Dr. Meschi's referral, Dr. Najjar's notes state that Claimant visited him because she was "very worried about developing an ulcer."  R.386.

apparently discontinued using Coumadin on the advice of Dr. Ayers, who felt that aspirin and folic acid would be sufficient. R.357, 386. Claimant complained to Dr. Najjar of "cold extremities" and chronic swelling in her left leg. R.358. Dr. Najjar noted that Claimant was following her prescribed regimen of "leg elevation, compression therapy and walking." R.357.

An April 28, 2007 study ordered by Dr. Najjar revealed evidence of 3 seconds of reflux in Claimant's left common femoral vein, superficial femoral vein, and popliteal vein. R.385. There also was reflux of between 2 and 3 seconds in Claimant's greater saphenous vein and 3 seconds of reflux in Claimant's distal calf perforator. *Id.* In layman's terms, these results mean that blood was pooling in Claimant's leg due to circulatory problems, which was the cause of her varicose veins.

### 5. Edward Hines, Jr. Veteran's Administration ("VA") Hospital & Aurora VA Clinic Records

Claimant visited the Hines Hospital Emergency Room in December 2007 complaining of worsening hip pain and groin pain. R.395. Tests found that she suffered from "mild diffuse osteopenia." R.467. Claimant was given Ultram for her pain and discharged. R.396. The record indicates Claimant also visited Hines in late 2007 for mental health treatment, during which time she was diagnosed with depression and prescribed antidepressants. R.406, 408, 409, 724. Claimant was referred to the Aurora VA Clinic for further treatment. R.407. An October 25, 2007 assessment done by social worker Michael Anderer reports that Claimant was "quite depressed, tearful, anxious, with panic . . . fatigue, low motivation, insomnia, [and] anhedonia." R.595. She was also having "difficulty problem solving and making decisions." *Id.* Mr. Anderer's assessment notes that Claimant rated the pain in her left leg as a 3 on a scale of 0–10. R.593. An assessment that may date from November 2007 reports Claimant was experiencing "depression[,] hopelessness, helplessness, fatigue, low energy, poor motivation, anhedonia,

difficulty making decisions, [and] difficulty focusing." R.646. This same assessment states that Claimant was experiencing "anxiety and panic, with hyperventilating" but was not experiencing memory loss or slowed thinking. *Id.* During this period, Claimant was also visiting the Hines Anti-Coagulation Clinic for her circulatory problems and being prescribed Codeine for pain. R.408, 432.

Claimant continued visiting Hines Hospital and the Aurora Clinic throughout 2008 and 2009 for treatment related to her circulatory problems, mental health, and other maladies as well as for preventive care. Throughout early 2008, she received regular treatment at Aurora for her mental health. R.427–28, 436–37. Although Claimant's panic attacks and depression had "gotten worse," an assessment which seems to date from January 2008 notes that the antidepressants were helping her. R.432.

At a July 18, 2008 appointment with Jan Sheldon, a nurse at Aurora, Claimant rated her leg pain as a 5 on a scale of 0–10, noting it was an 8 at worst and a 3 at best. R.855. Swelling was present at the pain site. *Id.* Nurse Sheldon's report states that treatment of Claimant's circulatory problems is "ongoing and lifelong" and that because of her thrombosis, Claimant has "severe immobilizing pain" and "marked swelling" in her left leg. R.789. Nurse Sheldon's report also states that Claimant "would not benefit from any surgical procedure to alleviate . . . [her] pain." *Id.* On July 21, 2008, Claimant was admitted to Hines apparently in connection with her circulatory problems, and she was discharged two days later with instructions to resume taking Coumadin. R.791–92. Claimant resumed taking Coumadin either at this time or earlier, and she was taking Coumadin at the time of the hearing. R.962, 967.

At an August 12, 2008 visit to Hines, Claimant stated that her leg pain was "constant" and "ongoing." R.808. Claimant again rated her pain as a 5 on a scale of 0–10, noting it was an

8 at worst and a 3 at best.  *Id.*  A note dated April 20, 2009 regarding a subsequent visit to the Hines ER states that Claimant was concerned she had experienced another thrombosis, having noticed increased swelling and pain in her leg.  R.940.  According to the treatment notes, there was no evidence of a deep vein thrombosis in Claimant's leg.  R.867.  Claimant was instructed to keep her legs elevated and take Tylenol for pain.  R.941.  Another report from this visit notes Claimant's diagnosis of varicose veins and the swelling in her lower extremities.  R.900, 941.  Hospital personnel ordered two pairs of compression stockings for Claimant's left leg.  *Id.*

### 6.    SSA Examining Physicians and Psychologists

Dr. Charles Wabner performed a physical residual functional capacity (RFC) assessment[6] dated March 24, 2008 in which he concluded that Claimant was limited in various ways: (1) she could occasionally lift or carry up to 20 pounds; (2) she could frequently lift or carry up to 10 pounds; (3) she had to stand or walk for at least 2 hours in an 8-hour workday; (4) she could sit for about 6 hours in an 8-hour workday; (5) she could stoop frequently and occasionally crouch, kneel, crawl, balance, and climb ramps, stairs, ladders, ropes or scaffolds.  R.547–53.  Dr. Wabner concluded that Claimant's "symptoms" of "factor IV leiden folate deficiency [sic], vascular damage to main artery in of [sic] left leg, severe circulation problems, severe varicose veins, leg discoloration, and depression" were consistent with the medical evidence.[7]  R.551.  Dr. Wapner also concluded that despite being limited in performing activities like climbing stairs and sitting for 2 hours without changing positions, Claimant was "not totally precluded" from such activities.  R.553.

---

[6] The RFC is the most a claimant can do despite the effects of her impairments.  20 C.F.R. § 404.1545(a).

[7] Claimant actually has a Factor V Leiden mutation, which is better described as a genetic disorder rather than a symptom.

On February 25, 2008, at the request of the SSA, Dr. Roopa Karri briefly examined Claimant and reviewed her medical records.  R.517.  Dr. Karri's report does not contain a recommendation but states that Claimant "was able to get on and off the exam table . . . could walk 50 feet without support" and had good range of motion and use of her limbs.  *Id.*  It also notes that Claimant displayed "trace edema . . . poor grip . . . [and] cannot open jars."  R.518.

Psychologist Barbara Sherman also reviewed Claimant's medical records and performed an examination.  Ms. Sherman concluded that Claimant suffers from "Mood Disorder due to medical condition with depression" but deferred a diagnosis.  R.526.  Sherman observed that Claimant showed "vegetative signs of clinical depression" but was otherwise adequate in all cognitive areas "except for attentional focus."  R.527.  Her report also notes that Claimant's "[c]ommonsense reasoning and judgment are good."  *Id.*

Psychologist Margaret Wharton performed a mental residual functional capacity assessment dated March 16, 2008.  Her report describes Claimant as suffering from "MOOD DISORDER DUE TO GENERAL MEDICAL CONDITION."  R.531, 544.  Wharton concluded that Claimant's interpersonal and adaptive skills were within normal limits and that her depressive symptoms only moderately limited her ability to carry out detailed tasks.  *Id.*

**D.      The ALJ's Decision – January 6, 2010**

After a hearing and review of the evidence, the ALJ found that Claimant was not disabled under the Social Security Act and denied her application for disability insurance benefits.  R.31.  The ALJ evaluated Claimant's application under the required five-step sequential analysis.  At step one, the ALJ determined that Claimant had not engaged in substantial gainful activity since the amended date of September 15, 2007 on which she allegedly became unable to work due to a disability through her date last insured of June 30, 2009.  R.25.

11

At step two, the ALJ determined Claimant had the following severe impairments: "a history of Factor 5 Leiden and Protein S deficiency with increased risk for deep vein thrombosis in the left leg; a history of osteopenia; obesity; and a history of depression/mood disorder." R.25. At step three, the ALJ determined that, through her date last insured, Claimant "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R.26. In making this determination, the ALJ found that Claimant's mental impairments were only "mild" or "moderate" difficulties which did not rise to the level of the listed mental impairments and that Claimant's physical problems did not rise to the level of the listed musculoskeletal, cardiovascular or blood disorders. *Id.*

The ALJ proceeded to consider Claimant's RFC and found her capable of performing sedentary work, "except the claimant would require the option to sit/stand at will and elevate her left leg on a foot stool; never climb ladders, scaffolds or ropes; avoid concentrated exposure to work hazards; and also be limited to work that is unskilled (not require complex/detailed tasks)." R.27.

In making this determination, the ALJ seems to have been persuaded by various pieces of evidence, including Dr. Ayers' view in April 2007 (before Claimant's disability onset date) that Claimant's circulatory problems could be controlled with aspirin rather than anti-coagulant medication. R.27. The ALJ also stated that the absence of a report from a current treating physician with respect to "claimant's current condition or treatment for her Factor V Leiden or protein S deficiency" weighed against her. R.28. The ALJ observed (though in apparent error) that there was no report from Dr. Ayers in the record. *Id.* The ALJ also pointed to a blood flow

12

study ordered by Dr. Najjar which did not reveal a thrombosis, "revealed only superficial venous reflux," and "was interpreted as being normal." R.28-29.

As to Claimant's mental impairments, the ALJ was persuaded that they were not a bar to employment, focusing on psychologist Sherman's observations that Claimant was well-oriented, drove herself to the exam, was immaculately dressed, and demonstrated good reasoning and judgment. R.28. The ALJ also was influenced by Hines treatment records from 2009 indicating that Claimant's depression was improving and that her global assessment functioning score was 65. R.28–29. The ALJ concluded that the medical evidence did not reveal any restrictions as a result of Claimant's depression, her obesity, or her other maladies which would prevent her from performing sedentary work. R.29.

As to Claimant's credibility, the ALJ found her "not fully credible" regarding her limitations given her hearing testimony that she is active, does shopping, drives her children to school, volunteers at school functions, and has accompanied her husband on fishing trips. R.29.

At step four, the ALJ concluded Claimant was unable to perform her past work which was skilled and semi-skilled in nature. R.30. At step five, however, the ALJ, in considering Claimant's age, work experience and RFC, found that there were jobs which existed in significant numbers in the national economy which Claimant could have performed. *Id.* Because of her step five finding, the ALJ concluded that Claimant was not disabled under the Social Security Act. R.31.

## II. LEGAL STANDARDS

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes

the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* The scope of judicial review is circumscribed. This Court is limited to determining whether the ALJ applied the correct legal standards in reaching her decision and whether that decision is supported by substantial evidence in the record. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richard v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even if there is adequate evidence in the record to support the ALJ's conclusion, the decision will not be upheld if the ALJ's opinion contains contradictions or fails to "build an accurate and logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). In finding a claimant not disabled within the meaning of the Social Security Act, the ALJ's opinion "must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it will be remanded. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The court's review is limited to the reasons articulated in the ALJ's

14

decision.  *Campbell v. Astrue*, 627 F.3d 299, 306.  The reviewing court may enter a judgment either "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

**B.** **Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act.  *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009).  "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is under a disability if she is unable to do her previous work and, given her age, education and work experience, cannot partake in any gainful employment that exists in significant numbers either in the region where she lives or in several regions of the country.  42 U.S.C. § 423(d)(2)(A).  Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

A five-step analysis is utilized in evaluating whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(i-v).  Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work.  *Id*.  Once the claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

# III. DISCUSSION

Claimant raises the following issues in support of her motion to reverse the ALJ's decision: (1) whether the ALJ properly discounted Claimant's credibility; (2) whether the ALJ misstated or misapprehended facts in the record in way that undermined her decision and was not harmless error; (3) whether the ALJ properly analyzed Claimant's mental impairments; and (4) whether the ALJ's decision to deny benefits should be reversed and benefits should be awarded to Claimant by this Court.

## A.     The ALJ Failed to Articulate Fully Why She Found Claimant's Testimony Concerning Her Condition Not Credible

Prime among her arguments in this appeal is Claimant's contention that the ALJ did not properly evaluate her credibility or articulate her reasons for discounting Claimant's testimony. (Pl's Br., at 10).  When a claimant alleges subjective symptoms like chronic pain, the ALJ should evaluate the credibility of a claimant's testimony about her symptoms.  Social Security Ruling ("SSR") 96–7p.  In evaluating a claimant's credibility, the ALJ must articulate her reasons for her credibility determinations.  *Brindsi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).  The ALJ is not required to list the seven factors cited in SSR 96–7(b) as components of a proper credibility analysis.[8]  *Id.*  However, simply restating the seven factors is not equivalent to compliance with the SSR's legal standard on credibility determinations.  As the court of appeals noted in *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002), "[i]nvoking a legal rule does not substitute for complying with the requirements of that rule . . . ."

---

[8] SSR 96–7p requires consideration of: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual has received for the relief of pain or other symptoms; (6) measures other than treatment, that the individual uses to relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms.

For example, in *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011), the reviewing court reversed an ALJ who failed to adequately explain an adverse credibility determination against a claimant, instead offering a "perfunctory" opinion containing a "boilerplate recital" of language found in other ALJ opinions denying benefits to applicants on credibility grounds. Instead of connecting the credibility determination to the evidence, the ALJ offered "no explanation of which of [the claimant's] statements are not entirely credible or how credible or noncredible any of them are," rendering the ALJ's conclusion "suspended over air" rather than supported by a logical bridge to the evidence. *Id.* at 696–97.

In the instant case, the ALJ's formal credibility analysis is confined to a single, brief paragraph in the opinion explicitly addressing only the first of the seven required factors of a credibility determination, the extent and range of Claimant's daily activities. R.29. The ALJ asserts in a conclusory way that Claimant's testimony is "not fully credible," and then notes that "[s]he is active and does shopping. She drives her children to school. She attends school programs, volunteers to assist at school events and goes with her husband when he goes fishing. Her own testimony reveals that the claimant is not precluded from all work." *Id.*

Case law in the Seventh Circuit and elsewhere, however, holds that daily activities such as those engaged in by Claimant do not contradict a claim of disabling pain. *See, e.g.*, *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000) ("[M]inimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"); *Villano*, 556 F.3d at 563; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *see also Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005) ("The fact that [a claimant] tries to maintain her home and does her best to engage in ordinary life activities is not inconsistent with her complaints of pain, and in no way directs a finding that she is able to engage in light work.").

17

It is obvious from her opinion that the ALJ did not believe Claimant's subjective evaluation of her pain or the effects of her depression upon her ability to engage in gainful employment.  But the ALJ never articulates a coherent credibility analysis that leads to that conclusion. For example, the ALJ mentions in one part of her opinion that Claimant told a medical treater that her former husband was abusive and made her stop working.  R.28.  The ALJ, however, does not tie this statement to her credibility analysis, so it is impossible to know what weight, if any, the ALJ placed on it.  As discussed in the following sections of this opinion, the ALJ also focuses selectively on certain evidence in the record without addressing other contradicting evidence that might not support the conclusion she reached concerning Claimant's credibility.

Much like the flawed credibility analysis in *Martinez*, the ALJ's credibility determination here is simply "suspended over air," *Martinez v. Astrue,* 630 F.3d at 696.  It is not supported by a logical bridge from the cited evidence to the legal conclusion as required by law.  It may be that the ALJ had solid reasons for determining that Claimant's subjective complaints of pain were not credible or did not render her incapable of gainful employment, but she did not articulate the rationale for that conclusion in a way that permits the Court to review it.

**B.      The ALJ Failed To Articulate Her Rationale For Discounting Claimant's Testimony That She Needs To Elevate Her Leg Above Her Head To Relieve Her Pain**

Claimant argues that a number of misstatements by the ALJ undermine her conclusion that Claimant was not disabled under the Social Security Act.  (Pl's Br., at 5–9).  Claimant argues that, at a minimum, some of these misstatements raise legitimate questions as to how thoroughly the ALJ evaluated the record evidence.  This Court agrees.

The first of these misstatements has to do with the height Claimant needs to elevate her leg to relieve her pain.  Claimant testified, "I need to lay down and actually elevate my leg

throughout the day to get the pressure off." R. 46.  When the ALJ asked Claimant how high she

needs to elevate her leg, Claimant said, "Well, if I'm laying down, generally probably about

three feet, just so it's above my head."  *Id.*  The ALJ then asked Claimant, "What if you're

sitting?"  Claimant responded saying, ""When I'm sitting, when I was working we tried using,

they have actual special stools that you can use for elevation, and that probably was, it was

probably about six inches off the floor, but it still didn't seem to help with the edema."  *Id.*  The

ALJ then asked again, "When you sit now how high do you have to elevate it?"  And Claimant

responded saying, "I have my, I have my foot propped up right now probably about four inches -

- -." R.46-47.  Later in her testimony, the ALJ asked Claimant, "but when you do elevate your

leg while you're lying down, how long, generally do you lie down for?"  R.56.  Claimant

responded saying, "Probably 45 minutes to an hour, usually."  *Id.*  The ALJ asked her how many

times a day she did that, and Claimant said, "I probably do that four times a day."  *Id.*

Claimant correctly argues that the ALJ's opinion contains contradictory statements about

how high Claimant needs to elevate her left leg to relieve her pain without any analysis as to how

that conflict should be resolved.  (Pl's Br., at 11–12).  Initially, the ALJ states that Claimant's

RFC allows her to perform sedentary work provided she can "elevate her left leg on a foot stool."

R.27.  Several paragraphs later, however, the ALJ notes that "[w]hen [Claimant] sits, she must

elevate her leg above her head."  *Id.*

The determination of the height at which Claimant must elevate her leg to experience

pain relief is critical to analyzing Claimant's ability to find gainful employment.  In posing two

hypotheticals to the VE regarding Claimant's ability to find gainful employment, for example,

the ALJ initially proposed a fact pattern premised on Claimant experiencing pain relief simply by

elevating her leg on a footstool.  R.58  ("…[s]uch an individual needs to be allowed to elevate

her left leg [sic] basically footstool, with a footstool.")  Answering this hypothetical, the VE opined that there were several jobs such an individual could perform.  *Id.*  A follow-up hypothetical posed by the ALJ appeared to accept Claimant's testimony that she needed to frequently elevate her leg above her head.  R.59  ("…And if the individual would be off-task 20 percent of the workday because of the need to lie down and elevate the leg?").  Answering this latter hypothetical, the VE opined that such an individual would be unable to find "competitive employment."  *Id.*

The ALJ apparently concluded that Claimant has the RFC to perform sedentary work provided that she has the option to sit and stand at will and elevate her left leg on a foot stool.  R. 27.  It is not clear from the ALJ's opinion, however, why she believed that Claimant could experience pain relief simply by elevating her leg on a footstool.  The ALJ never explains how she dealt with Claimant's testimony that she needed to elevate her leg above her head multiple times throughout the day, for 45 minutes to an hour each time, to relieve the pressure in her leg.  The ALJ recognizes and even credits this testimony from Claimant in one of her hypotheticals to the VE, but she never discusses the significance of Claimant's testimony to this effect it in her opinion.

It is conceivable that the ALJ found Claimant's testimony about the need to elevate her leg above her head not credible and simply discounted it.  But, if that is what the ALJ did, then she did not explain her reason for doing so.  The failure to articulate that link makes it impossible for this Court to determine whether the ALJ's rationale or conclusion that Claimant can perform sedentary work is supported by substantial evidence in the record.

In *Villano, supra,* 556 F.3d at 563, the Seventh Circuit vacated an ALJ's decision to deny disability benefits because the ALJ failed to consider a claimant's obesity and ignored the

claimant's testimony about suffering frequent crying spells due to depression rather than explaining whether this testimony was deemed not credible. *Id*., at 562–63. Much like the ALJ in *Villano,* the ALJ in this case neglected to explain why she ignored Claimant's testimony about her need to elevate her leg above her head to experience pain relief in reaching her conclusion that Claimant was not disabled. The ALJ here seems to have concluded that Claimant could relieve her pain simply by elevating her leg on a footstool, but that was not Claimant's testimony. In choosing to simply ignore rather than confront Claimant's testimony about her need to elevate her leg above her head four times a day in reaching her conclusion that Claimant could work, the ALJ failed to build a logical bridge from the evidence to her determination that Claimant is not disabled under the Social Security Act.

The deficiencies discussed above in Sections III.A and III.B of this opinion require remand. The Court would have to independently review and analyze the evidence bearing on Claimant's credibility and the steps Claimant needs to take to relieve the pain in her leg to uphold the ALJ's decision on these issues. That is not something the Court can or should do under these circumstances. *Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010).

**C.**    **The ALJ's Opinion Contains Additional Misstatements That Are Not Harmless**

Claimant also points to additional misstatements or omissions of material facts in the ALJ's opinion which could undermine the soundness of her decision to deny Claimant disability benefits. In light of the Court's decision to remand this matter for further proceedings before the ALJ for the reasons discussed above, it is unnecessary to deal in depth with the rest of Claimant's arguments in support of remand or reversal. The Court does, however, note the following additional issues that the ALJ should revisit on remand.

First, the ALJ states in error that there is no report in the record from Dr. John Ayers who treated Claimant in April 2007. The Commissioner concedes that the ALJ's opinion mistakenly asserts there is no report in the record from Dr. Ayers.  (Def's Resp., at 6).  Dr. Ayers report is in the record at R.361-363.  Further, although the ALJ refers to Dr. Ayers as "claimant's main treating physician" (R.27), it is unclear why she does so since there is no evidence Dr. Ayers saw Claimant after an office visit in April 2007 (before Claimant stopped working) at the request of Dr. Zoretic, to whom Dr. Ayers directed his written report.  Claimant subsequently saw Dr. Najjar later in April 2007 and then was seen repeatedly over a two-year period at the Hines VA Hospital and the Aurora VA Clinic.  To the extent, however, that the ALJ holds it against Claimant that there is no report in the record from Dr. Ayers, who the ALJ believed was Claimant's main treating physician, the ALJ's statements and apprehension of the facts are materially incorrect.

Second, the ALJ seems to ascribe significance to the fact that Dr. Ayers told Claimant she did not need to continue taking Coumadin and could take aspirin instead.  R.29.  While it is true that Dr. Ayers did tell Claimant she could take aspirin rather than continue with prescribed Coumadin in April 2007, Claimant resumed taking Coumadin in October 2007 and continued to take it through at least June 2009, the most recent treatments noted in the record.  R.962, 967. The Commissioner correctly points out that the ALJ, elsewhere in her opinion, does say that Claimant was being maintained on Coumadin in 2008.  R.28.  It is puzzling, then, why the ALJ notes twice in her opinion (R.27, 29) that a physician who saw Claimant in 2007 said "claimant's condition was not severe and she was switched from Coumadin to being maintained with only aspirin" (R.29) when that was not Claimant's treatment regime in 2009 at the time of the hearing. To the extent that the ALJ relied upon the fact that Claimant stopped taking Coumadin for a time

in 2006 or 2007, but then failed to acknowledge that Claimant resumed taking that anti-coagulant medication in 2008 and 2009, the ALJ should revisit on remand the significance to her ultimate conclusion, if any, of these facts.

Third, the ALJ notes that Claimant suffers from "only superficial venous reflux." R.29. The ALJ makes this comment in the context of a review of Claimant's medical records that the ALJ says indicate that Claimant's condition has stabilized and does not preclude sedentary work. Claimant argues that to the extent the ALJ uses the term "superficial" to mean insignificant or not serious, rather than near the skin, which is the medical inference from that term, then the ALJ misperceived the import of the term in Dr. Najjar's report.

Claimant points out that Dr. Najjar's report indicates reflux in the common, superficial *and popliteal veins* (R.385) (emphasis added). The popliteal vein is a deep rather than a superficial vein, and deep venous reflux is a condition that is treated with compression stockings and elevation whereas superficial reflux can be treated with surgery (R.387). Thus, in addition to superficial venous reflux, Dr. Najjar reported that Claimant had deep vein reflux which is treatable only with compression stockings and leg elevation, and not with surgery. R.387. Claimant's prescribed treatment included wearing compression stockings and leg elevation, classic treatment for deep venous reflux. *Id.* Further, Nurse Jan Sheldon at the Aurora VA Clinic notes in her report of a July 18, 2008, visit with Claimant that she "would not benefit from any surgical procedure to alleviate . . . [her] pain" (R. 789), another indication of deep venous reflux.

Claimant argues that the ALJ misunderstood the severity of Claimant's condition and that this mistake infected her entire analysis. The Commissioner acknowledges that the ALJ failed to mention the evidence of deep venous reflux, but argues that this omission is harmless. (Def's

Resp., at 5). Although it is impossible to know the impact on her ultimate conclusion of the ALJ's statement that the blood flow tests performed on Claimant revealed "only superficial venous reflux," that statement is, at a minimum, factually incorrect in light of Dr. Najjar's report and Claimant's post-diagnosis treatment for deep venous reflux. It also potentially could be problematic to the extent it implies the ALJ concluded, wrongly, that Claimant was suffering from an insignificant medical condition.

Further, the ALJ concluded that "[t]he paucity of treatment records from 2008 and 2009 with respect to claimant's legs reveals that her impairment is being controlled." R.29. But if Claimant has deep venous reflux, and the treatment options for that condition are compression stockings and leg elevation, then Claimant did not have treatment options available to her that would require consistent doctor or hospital visits. So, the "paucity of treatment records from 2008 and 2009," the time period after she was diagnosed with deep venous reflux, should not be held against Claimant. Yet the ALJ appears to have done just that here. These errors alone would merit remand. *Myles v. Astrue,* 582 F.3d 672, 676 (7th Cir. 2009). It is impossible for this Court to find that the ALJ would have reached the same conclusion had she fully appreciated Dr. Najjar's diagnosis and Claimant's treatment options, or whether, in fact, she had that understanding.

Finally, on remand, the ALJ should engage in a more fulsome analysis of how limiting Claimant to sedentary work accommodates her limitations in concentration, persistence, or pace. *See O'Connor –Spinner v. Astrue,* 627 F.3d 614, 620 (7th Cir. 2010). For example, the ALJ cites Claimant's GAF (global assessment of functioning) score of 65 to support her conclusion that Claimant's depression does not prevent from performing any work. R.28-29. But Claimant points out that the ALJ did not discuss Claimant's other GAF scores in the record of 50-41

(representing serious symptoms) and 55 (representing moderate symptoms). R.407, 997. On remand, the ALJ should take into consideration whether Claimant's impairment as a result of her depression fluctuated in such a way that might preclude her from holding down full-time employment. *Bauer v. Astrue,* 532 F.3d 606, 609 (7th Cir. 2008) ("Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.")

In assessing whether misstatements amount to harmless errors, the Court acknowledges it must attempt to determine whether a contrary decision could have been reached by a reasonable ALJ given the presence of such misstatements. *McKinzey v. Astrue*, 2011 WL 2162903, at *7 (7th Cir. 2011). The Eighth Circuit has phrased this inquiry alternatively as whether the alleged errors had a "practical effect on the outcome of the case." *Draper*, 425 F.3d at 1130, quoting *Reeder v. Apfel,* 214 F.3d 984, 988 (8th Cir. 2000). If a court concludes that the ALJ's decision is "riddled with inarticulate reasons for the result," it should be remanded. *Clifford*, 227 F.3d at 874.[9] This Court cannot say with confidence that the cumulative effect of the errors discussed above is harmless. Indeed, it is possible that these errors had a very real impact on the outcome of the case before the ALJ. Thus, remand here would not be a "waste of time," *Spiva v. Astrue,* 628 F.3d at 353.

## D. A *Sua Sponte* Award of Benefits By This Court Is Not Warranted On This Record

Claimant argues that the flaws in the ALJ's opinion entitle her to reversal of the ALJ's decision and the *sua sponte* entry of judgment in her favor awarding her the disability benefits she seeks. (Pl's Br., at 16–17). Despite the lack of a logical bridge from the evidence to the

---

[9] An illustrative example of a non-harmless error is found in *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 538–39 (7th Cir. 2003), where an ALJ's decision to deny benefits was vacated because the ALJ focused solely on the medical problems in a claimant's left hand despite allegations of pain in her right hand, asserting incorrectly that there was "no medical evidence of a right hand problem."

ALJ's conclusion, the ALJ's potential misunderstanding of some of the evidence, her factual errors and her failure to discuss all of the evidence bearing on her stated conclusions, a reversal and an automatic award of disability benefits to Claimant by this Court is unwarranted on this record. There is evidence cited by the ALJ in her opinion, and other evidence that the ALJ failed to discuss or address in her opinion, that may indicate Claimant is not disabled from working. Under these circumstances, this ruling should not be interpreted as the Court's reading of the record to establish conclusively that Claimant has a disability which prevents her from working. Indeed, a complete review of the evidence in the record may lead to the opposite conclusion. The ALJ's opinion, however, is silent or nearly silent in many important respects as to whether or how much of that evidence was considered in the decision to deny Claimant the disability benefits she seeks. The Court will not, and should not, speculate on the final outcome when all that evidence has been considered.

## IV. CONCLUSION

For the reasons set forth herein, Claimant Tammy L. Voight's motion to reverse the decision of the Commissioner [Dkt#18] is granted in part and denied in part. The decision of the Commissioner is reversed and this matter remanded to the SSA for further proceedings consistent with this Memorandum Opinion and Order. This is a final appealable order.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated:  December 12, 2011